IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DEBORAH R. LYONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:08-cv-627 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Thomas A. Wiseman, Jr. |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Before the Court are Plaintiff Deborah R. Lyons' Motion for Judgment on the Administrative Record (Doc. No. 14) and supporting memorandum (Doc. No. 15), as well as the Defendant Commissioner's Motion for Judgment on the Administrative Record (Doc. No. 18) and supporting Memorandum (Doc. No. 19). Plaintiff seeks judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act") on the grounds that the ALJ failed to provide sufficient justification for discounting the opinions of Plaintiff's treating physician, erred in concluding Plaintiff did not have a valid diagnosis of fibromyalgia, and erred in discounting Plaintiff's credibility. In response, and in support of his own motion, the Defendant asserts that the agency's decision denying benefits is supported by substantial evidence in the record and should be upheld.

The prior referral of this case to the Magistrate Judge is withdrawn and the Court finds, as explained below, that the Commissioner applied the appropriate legal standards and his decision is supported by substantial evidence in the record. Plaintiff's Motion for Judgment on the Administrative Record will therefore be denied, the Commissioner's motion granted, and the underlying decision by the ALJ affirmed.

I.    BACKGROUND

    A.    Procedural history

Plaintiff protectively applied for DIB and SSI benefits on September 21, 2004 alleging that she had been disabled since June 1, 2003 due to impairments to her back and shoulders. (*See* Doc. No. 12,

Certified Transcript of Administrative Record ("AR"), at 35, 45–47, 49, 53.) Plaintiff's claims for SSI and DIB were denied initially, and her SSI claim was denied upon reconsideration. (AR 37–39, 41–42.) Plaintiff's DIB claim was initially denied based upon a finding that she was no longer insured for DIB. Because it was determined that she had worked briefly in 2004 and had thereby earned additional quarters of coverage, her "last-insured" date was revised to March 31, 2005. (AR 14, 48.) Upon Plaintiff's request, a hearing was held on February 13, 2007 before Administrative Law Judge ("ALJ") John P. Garner, at which Plaintiff was represented by counsel. Because of the revision of the last-insured date, both the Title II and Title XVI claims were before the ALJ. The ALJ issued his decision denying both claims on May 25, 2007 on the basis that Plaintiff had not established that she had been under a disability at any time from June 1, 2003 through the date of the decision. (AR 11–21.) Plaintiff's request for review by the Appeals Council was denied on April 14, 2008 (AR 5–8), which rendered the ALJ's decision the final administrative decision by the Commissioner. Plaintiff has filed this action seeking review of that decision pursuant to 42 U.S.C. § 405(g).

B.      **Plaintiff's Age, Education and Work Experience**

Plaintiff was born in 1962 and was forty-four years old at the time of the hearing and has at all relevant times been classified as a "younger individual" for Social Security purposes. 20 C.F.R. § 404.1563. She stopped working on July 4, 2003. (AR 247.) She returned to work for a short period of time in 2004, but the ALJ found that this work did not rise to the level of substantial gainful activity. (AR 14, 16, 247.)

Plaintiff has a ninth-grade education (AR 247) and is unmarried (AR 46). At the time of the hearing she lived with her mother and son. (AR 256, 257.) Her past relevant work includes experience as a housekeeper, salad bar attendant and dry cleaner attendant. (AR 258.)

C.      **Plaintiff's Medical History**

Although Plaintiff alleged in her SSI and DBI applications that she was disabled as of June 2003, the record is replete with statements by her indicating that she did not begin experiencing severe pain until 2004. Moreover, she apparently did not begin seeking regular medical treatment for any condition until 2004. In her motion, Plaintiff does not dispute the reasonableness of the ALJ's determination that she did not have a medically determinable severe impairment prior to July 1, 2004.

The medical record reflects that, on May 27, 2004 at a "routine clinic visit" at the Vine Hill Clinic, Plaintiff reported to Family Nurse Practitioner Iris Padilla that her "arms and legs hurt all over" and that her left knee hurt. Padilla recommended ibuprofen. (AR 110–11.) A month later, to Nurse Practitioner Alison Cohen at the same clinic, Plaintiff reported chronic pain and aching all over in her arms, hands, legs and feet. Plaintiff claimed she had been experiencing pain for three to four years, and that Lortab was the only thing that helped. On physical examination, she had normal range of motion, normal strength, no swelling or inflammation in the joints, and her gait was symmetric and unlabored. The nurse practitioner prescribed Ibuprofen 800 mg., diagnosed "chronic polyalthralgias," and made a note to rule out fibromyalgia. (AR 111–13.)

In July 2004 Plaintiff was seen at the Meharry Family Practice Center, where she complained of pain specifically in her left shoulder (rating the pain at 10 on a 10-point scale), but was not experiencing any decrease in her range of motion or strength. She was noted to appear to be crying and in distress. (AR 122.) A few days later, she again presented at the Meharry Family Practice Center and reported she had been experiencing left arm and shoulder pain for three years, which had increased over the preceding three weeks. She was again noted to be crying and in distress. She reported having previously been referred to an orthopedic surgeon, who was unable to help her. On physical examination, she was noted this time to have limited range of motion in her shoulder and positive results from both Phalen's and Tinel's tests.[1] (AR 121.)

She was sent for an MRI of her left shoulder and cervical spine on September 2, 2004. The results of the shoulder MRI indicated supraspinatus tendinosis at humerus insertion; mild degenerative change in the AC joint with mild compression of underlying supraspinatus myotendinous junction. (AR 95–96.) The cervical spine MRI showed: (1) mild narrowing of C4-C5-C6 disc space with 3 mm symmetrical central disc bulge and mild compression of ventral surface of the thecal sac and cord, mild effacement of epidural fat in both neural foramen; (2) 4 mm paracentral disc bulge right; (3) 4 mm right paracentral disc bulge C4-C5 with compression of the ventral surface of thecal sac and cord; end plate spurs with mild effacement of epidural fat in neural foramen; and (4) mild endplate spurring with

---

[1] The Court notes that these tests are typically used for the purpose of diagnosing carpal tunnel syndrome and presumably would indicate nerve damage.

effacement of epidural fat left C3-Cr neural foramen; but no herniated nucleated pulposus, fracture or dislocation. (AR 94–95.)

In October Plaintiff began treatment with Dr. Antoinne Able. During that time frame she began complaining that worsening pain was making it difficult to sleep and was now radiating into her hand. (AR 118–19.) She indicated that the medications Dr. Able prescribed (Percocet, Neurontin) were not helping. (AR 116.)

On January 10, 2005, consulting physician Dr. George W. Bounds, Jr. completed a Physical Residual Functional Capacity Assessment based on his review of the Plaintiff's medical records to date as of that time. (AR 126–31.) Based on his review of the record, Dr. Bounds opined that Plaintiff was capable of occasionally lifting fifty pounds, frequently lifting twenty-five pounds, could stand or walk about six hours in an eight-hour work day, could sit about six hours in a workday, and had an unlimited ability to push and pull. She was considered to be limited to only occasional climbing of ladders, ropes, and scaffolds, but could frequently perform other postural activities including climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling. She had limited fingering and handling abilities on the left but was unlimited in reaching and feeling. Dr. Bounds noted that Plaintiff's allegations of pain were "partially credible" (AR 130) based on the results of her cervical spine MRI, tenderness in the cervical spine and decreased left grip strength.

Plaintiff was referred at the beginning of 2005 to physical therapy; she attended twelve therapy sessions from January through March 10, 2005. The treatment note from the last visit indicates she had experienced some decrease in her pain level, but that exercise continued to exacerbate her pain level. (AR 137–48.)

Plaintiff had a follow-up visit with Dr. Able on March 15, 2005. His diagnosis at that time was left shoulder tendinosis. He noted that Plaintiff reported that physical therapy did not help, but Lortab did. She was still experiencing pain radiating down her left arm with some numbness and tingling. Dr. Able further noted that her affect was again tearful. He prescribed Lortab and trazodone. (AR 199.)

Two days later, Dr. Able completed a Medical Source Statement indicating that he had treated Plaintiff from October 2004 through March 15, 2005. (AR 218.) On that form, he reported that he had diagnosed Plaintiff with left shoulder tendinosis and checked off a box to answer "yes" to the question of

whether there were "objective tests to quantify precise level of pain . . . or other subjective symptoms." (AR 217.) He also checked "*yes*" in response to questions of whether Plaintiff's "symptoms [were] consistent with impairments from which she suffers"; whether stamina and endurance were affected to the extent that she would have difficulty working for eight hours; whether it was reasonable to expect she would need to lie down intermittently during the course of the workday; whether she was experiencing depression, anxiety, difficulty concentrating; whether she had difficulty with manual dexterity or fine-motor dexterity; whether she could reasonably be expected to be absent from work more than three days a month; and whether her condition was exacerbated by physical and emotional stress. (AR 217–18.)

With respect to lifting, Dr. Able opined that Plaintiff could lift fifteen pounds occasionally and five pounds frequently. In answer to the question, "What medical findings support this?" he answered succinctly: "MRI." (AR 218.) He further indicated Plaintiff could stand or walk about six hours out of eight (and for four hours without interruption), but did not refer to any medical findings to support that conclusion. He indicated that sitting was not impaired, but that Plaintiff would need to lie down to rest for about two out of every eight hours. Requested to indicate what medical findings supported that assessment, Dr. Able responded: "N/A." (AR 218–19.) Finally, he indicated Plaintiff could frequently climb, balance and stoop and could occasionally crouch, but could never kneel, crawl or bend because "[p]ainful shoulder prevent[ed]" such activities. (AR 219.) In addition, he opined that "[s]houlder dysfunction will not allow" reaching, handling, feeling and pushing and pulling, and that she should avoid heights, moving machinery and vibrations. (AR 219–20.)

Plaintiff saw Dr. William L. Bacon, an orthopedic surgeon, for the first time on May 17, 2005. (AR 190.) According to Dr. Bacon's treatment note, Plaintiff reported experiencing left shoulder pain beginning in July 2004 when she was working as a dry-cleaning assistant. Dr. Bacon diagnosed cervical disc syndrome and impingement syndrome, and prescribed piroxicam, Lortab (AR 193), and an "over the door traction unit" (AR 194). The record also contains a note from Dr. Bacon dated July 12, 2005 indicating Plaintiff would be unable to work for six weeks. (AR 186.) At a visit with Dr. Bacon the same day, Plaintiff continued to complain about neck pain radiating into her shoulders but indicated it had improved. Upon physical examination, Dr. Bacon noted mild tenderness and some restriction in range of motion but no neurological defect. He also noted that the earlier MRI had shown "mild degenerative

changes" with a small bulge at C4-C5. He recommended Tramadol, home traction and outpatient physical therapy. (AR 187.)

Plaintiff's condition apparently remained much the same over the next several months. In February 2006, she underwent a cervical myelogram and post-myelogram CT scan. Neurologist Dr. Carl Hampf interpreted the scan as indicating "multilevel degenerative disc disease and spondylosis," which was "most pronounced at C4-5." (AR 133.) He also noted that spondylosis abutted but did not significantly compress the spinal cord, and that the results of the earlier MRI had overestimated the degree of compression. (*Id.*) Given the absence of significant cord compression, myelopathy or radiculopathy in conjunction with her multilevel disease, Dr. Hampf did not recommend surgical intervention. He recommended instead that she see a rheumatologist. (*Id.*)

Plaintiff saw a Dr. Robert Lemons at General Hospital in April 2006. Plaintiff then rated her pain as at 8 to 10 on a 10-point scale and reported that the pain "move[d] from spot to spot" in her neck and shoulder. (AR 177.) Dr. Lemons noted that Plaintiff's shoulders were tender to palpation and that fibromyalgia was "possible"; he too recommended a referral to rheumatology. He likewise noted that the CT scan showed multi-level degenerative disc disease and spondylosis but no stenosis. Upon physical examination, Plaintiff had full range of motion but some decreased strength. (AR 177.) She was prescribed Motrin and Lortab.

Plaintiff finally saw rheumatologist Howard A. Fuchs, M.D., on June 8, 2006 specifically for the purpose of confirming or ruling out a diagnosis of fibromyalgia. Dr. Fuchs' notes indicate that Plaintiff reported having suffered from diffuse pain and aching for approximately a year, with morning stiffness and aching. She claimed Lortab relieved her pain better than Motrin. According to Dr. Fuchs' examination notes, Plaintiff presented with a depressed affect and appeared anxious. Parts of the notes are difficult to decipher, but they do indicate "no distinct tender points." (AR 167.) Under "final diagnoses," Dr. Fuchs noted simply: "Diffuse pain. No [complaints of] ongoing CTD [connective tissue disease] or AI [autoimmune] disease." (AR 167.) He suggested Plaintiff work on "exercise/sleep hygiene and not use narcotics," but also noted that she did not "feel this will be of benefit." (*Id.*) He further recommended that she consider treatment with Elavil and Neurontin, and indicated that no follow-up examination was necessary.

Dr. Able apparently continued to see Plaintiff every two to three months through the beginning of 2007. Even though Dr. Fuchs fairly conclusively determined that Plaintiff did not have fibromyalgia, Dr. Able's treatment notes dating from after Plaintiff's consultation with Dr. Fuchs indicate a presumed diagnosis of fibromyalgia, and Dr. Able also continued to recommend referral to a rheumatologist. (*See, e.g.*, AR 154, 208 (treatment notes from 9/21/2006 and 2/1/2007). Dr. Able continued to prescribe Motrin and Lortab.

Dr. Able completed a second Physical Capacities Evaluation form on February 1, 2007. (AR 222–23.) On this form, Dr. Able checked boxes to indicate that Plaintiff could sit for no more than three hours at a time and stand or walk for less than one hour at a time, and could sit a total of four hours and stand or walk a total of two hours in an eight-hour workday. He indicated she could use her hands for simple grasping but not for pushing, pulling or fine manipulation; could not use her feet or legs for repetitive movements; could occasionally lift up to four pounds, could rarely lift from five to nineteen pounds and could never left twenty or more pounds; could occasionally carry up to nine pounds but never more than that; and could never bend, squat, crawl, climb or reach above shoulder. Dr. Able also indicated a moderate restriction around unprotected heights; total restriction against being around moving machinery, changes in temperature and humidity, driving automotive equipment and exposure to dust, fumes, gases. He further noted very generally that Plaintiff was "additionally limited" by moderate to moderately severe pain. The "remarks" section of the assessment was left entirely blank, and Dr. Able did not refer to any objective medical evidence or any evidence at all in the medical record in support of his assessment of Plaintiff's inability to perform many work-related activities.

### D.      Plaintiff's Testimony at the ALJ Hearing

At the hearing, Plaintiff described her pain as located from her neck to her spine, shoulders, arms and hands, on both sides. She described the pain as "sharp," and generally rated it as around a 9 on a 10-point scale. (AR 248.) She stated that when she takes her medications, the pain would mostly go away but she could still feel a "throbbing" and, once the medication wears off, the pain comes back. (AR 249.) She testified to experiencing pain daily, which she can only relieve by taking her medication and then lying down for twenty minutes or so. She also indicated that she lies down approximately three or four times throughout the day. Activity and cold, rainy weather exacerbate her pain. (AR 250.)

Typically, Plaintiff takes pain medication first thing in the morning, eats breakfast, and then lies down again.  On a good day, of which she generally has two in a given week, she feels good enough to sit up, talk, and interact with her son or other visitors.  On bad days, presumably the other five days of the week, she lies around, takes her pain medication at regular intervals, and tries not to move too much.  (AR 251.)  She estimated that she can only concentrate for approximately twenty minutes without interference from pain.  (AR 252.)  Moving and using her arms exacerbates the pain, and she is unable to use her fingers for fine motor dexterity because her "fingers start hurting" and she gets "sharp pains like needles sticking in them."  (AR 253.)  She also estimated she could only stand or sit for approximately fifteen minutes before having to change positions.  (AR 253.)  She agreed with Dr. Able's assessment that she would need to rest for approximately two hours out of an eight-hour workday.  She claimed she would not even try to bend or kneel, nor did she ever attempt to reach with her arms.  (AR 254.)  She estimated the most she could lift or carry was the equivalent of a can of peas.  (AR 254–55.)

Plaintiff testified that she does not need assistance in getting around the house, but she lives with her sixty-eight-year-old mother and twenty-four-year-old son, who together do all the housework.  Plaintiff does not drive because her license was suspended as a result of unpaid parking tickets.

E.      **Vocational Testimony at the Hearing**

Vocational Expert ("VE") Kenneth Anchor, Ph.D., also testified at the hearing.  He characterized Plaintiff's past work as housekeeper, salad-bar attendant and dry cleaner attendant as light and unskilled.  With reference to consulting physician Dr. Bounds' January 10, 2005 Physical Residual Functional Capacity Assessment (AR 126–31), the ALJ asked the VE whether those jobs were within the abilities of an individual capable of lifting fifty pounds occasionally and twenty-five pounds frequently; standing for six hours and sitting for six hours in and eight-hour workday; unlimited pushing and pulling; occasionally climbing ladders, ropes and scaffolds but otherwise frequently performing other postural activities; and limited handling and fingering on the non-dominant side.  The VE testified that this profile would allow for all of Plaintiff's past jobs and that there were also sedentary jobs in the regional economy that would accommodate the manipulative limitations described, including the jobs of telephone quotation clerk (more than 1000 jobs in the Tennessee market), telephone order taker (over 2400 jobs), charge account clerk (over 2000 jobs) and information clerk (over 900 jobs).

Referring to Dr. Able's Medical Source Statement dated March 17, 2005 (AR 217–20), the ALJ posed a hypothetical involving an individual capable of lifting fifteen pounds occasionally and five pounds frequently; standing or walking for six hours and unlimited sitting in an eight-hour day; frequently climbing, balancing and stooping, occasionally crouching and never kneeling, crawling or bending; and limited in reaching, handling, feeling, pushing and pulling, and asked the ALJ whether a person with those limitations could perform Plaintiff's past work. The VE testified that a person with those limitations could not perform the work of housekeeper, but should be able to perform the other two jobs. (AR 259.) However, the VE also agreed with the ALJ that work would be "limited" for a person whose stamina and endurance are affected to the extent that she would have difficulty working eight continuous hours without intermittent rest periods, each exceeding fifteen minutes. (*Id.*) The VE further noted that the dry cleaner attendant job, but not the salad-bar attendant job, would allow for a sit-stand option.

The VE testified that a person with the abilities set forth in Dr. Able's Physical Capacities Evaluation dated February 1, 2007, which included an ability to stand, walk and sit for a total of six hours in an eight-hour workday, would not be able to perform full-time work. (AR 260.)

On cross-examination, the VE further indicated that a mild to moderate limitation on the ability to concentrate would not have a significant effect on the ability to perform unskilled jobs.

With respect to lifting, the VE testified that a person limited to lifting zero to four pounds occasionally and five to nineteen pounds rarely would be able to perform Plaintiff's past work as salad-bar attendant, and would also be able to perform the sedentary jobs he had previously identified. (AR 261–62.) However, with the postural limitations added in—no bending, squatting, crawling, climbing or reaching above the shoulders—none of the past work would be available, but the sedentary jobs would be.

Finally, the VE testified that if the "difficulties that [Plaintiff] presented during her testimony are at the severe or extreme level, performing full-time work in a conventional job setting is going to present difficulties." (AR 264.)

**II.     THE ALJ'S DECISION**

In his decision dated May 25, 2007, the ALJ made the following specific findings:

1.      The claimant met the insured status requirements of the Social Security Act through March 31, 2005.

2.      The claimant has not engaged in substantial gainful activity since June 1, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).[2]

3.      Prior to July 1, 2004, the claimant did not have a medically severe impairment (20 CFR 404.1520(c) and 416.920(c)).

4.      As of July 1, 2004, the claimant has the following severe impairments: cervical degenerative disc disease and left shoulder tendonosis (20 CFR 404.1520(c) and 416.920(c)).

5.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

6.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours during an 8-hour workday.  She can occasionally climb ladders, ropes, and scaffolds and occasionally balance, stoop, kneel, crouch, and crawl.  In addition, she can frequently climb ramps and stairs and frequently handle and finger with her left upper extremity.[3]

7.      The claimant is capable of performing past relevant work as a housekeeper, salad bar attendant, and dry cleaner attendant.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

8.      The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(AR 16–21.)

## III.      APPLICABLE LEGAL STANDARDS

### A.      Standard of Review

This Court must affirm the Commissioner's conclusions absent a determination that the ALJ has

failed to apply the correct legal standards or has made findings of fact unsupported by substantial

evidence in the record.  42 U.S.C. § 405(g); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d

_____

[2] The ALJ noted that Plaintiff had earned approximately $1,300 in 2004, which actually exceeded her earnings in 1999, 2000, 2001 and 2002 but was nonetheless insufficient for the work to constitute "substantial gainful activity" under the applicable regulations.  (AR 16.)

[3] The Court observes that Dr. Bounds' and the ALJ's findings that Plaintiff could occasionally lift as much as fifty pounds and could ever climb ropes or scaffolds are somewhat ridiculous and are not supported by any medical evidence in the record.  As a matter of common sense, many physically healthy forty-year old women are not capable of lifting fifty pounds or climbing ropes.  It is difficult to conceive how one with documented left shoulder tendinosis and cervical spine disease could ever perform such feats of strength and agility.  Plaintiff has not raised any argument based specifically on that conclusion, however.  Regardless, although the ALJ accepted Dr. Bounds' findings in that regard, these abilities were apparently not required for the performance of Plaintiff's past work or other work in the economy identified by the VE.

1107, 1110 (6th Cir. 1994). Even if this Court were inclined to reach a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). Accordingly, a district court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.    The Social Security Act and Disability**

The central issue on appeal is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled during the relevant time period. To be entitled to DIB, a claimant must be insured for disability at the time she becomes "disabled" within the meaning of Title II of the Social Security Act. 42 U.S.C. § 423. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.* § 423(d)(1)(A). The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

*Id.* § 423(d)(2)(A).

In making a determination as to disability under the above definition, an ALJ is required to follow a five-step sequential evaluation set out in the Social Security Administration's regulations. 20 C.F.R. § 404.1520. In *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997), the Sixth Circuit summarized the five-step analysis as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is

not disabled.

> 5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Id.* at 529 (citing 20 C.F.R. § 404.1520).  Under the first four steps, the claimant has the burden of proof.

*Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 147–48 (6th Cir. 1990).  At step five, however,

the burden of proof shifts to the Commissioner.  *Id.* at 148.

## IV.  LEGAL ANALYSIS

Plaintiff claims that the ALJ committed reversible error in the following respects:

(1)    That the ALJ failed to provide sufficient justification for discounting the opinions of Plaintiff's treating physician, Dr. Able;

(2)    That the ALJ erred as a factual matter in determining that Plaintiff did not have a viable diagnosis of fibromyalgia; and

(3)    That the ALJ erred in discounting Plaintiff's credibility in light of the medical evidence.

The Court will address each of these contentions in turn.

### A.    The ALJ Did Not Err in Discounting Plaintiff's Treating Physician's Opinions

The ALJ expressly accepted some parts and rejected other portions of Dr. Able's Treating Source Statement dated March 17, 2005 (AR 217–20).  Specifically, he noted that he "accept[ed] and g[a]ve[] considerable weight" to that portion of the opinion that was consistent with the "performance of a limited range of light work."  (AR 20.)  He specifically rejected those portions of Dr. Able's opinion assessing additional limitations, including a need for a sit/stand option, the need to rest for two hours out of every eight, and mental problems including difficulty concentrating.  (*Id.*)  In addition, the ALJ gave no weight at all to Dr. Able's medical source statement from February 2007, which indicated Plaintiff was incapable of performing even sedentary work, based on the ALJ's conclusion that these limitations were not supported by the objective evidence in the record.  In support of his rejection of the later statement, the ALJ observed that it was much more restrictive and completely inconsistent with the assessment completed two years earlier although there was little indication in the record that Plaintiff's condition had significantly deteriorated in that time frame.  He also noted that Dr. Able's diagnosis of fibromyalgia was inconsistent with rheumatologist Dr. Fuchs' conclusion that Plaintiff did not have fibromyalgia, and that Dr. Able appeared unaware of that conclusion or even that Plaintiff had consulted with a rheumatologist.

Social Security regulations require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R. § 404.1527(d)(2). Medical opinions are defined as opinions about the nature and severity of an individual's impairment(s), 20 C.F.R. §§ 404.1527(a), and they are the only opinions that may be entitled to controlling weight. S.S.R. 96-2p, 1996 WL 374188 at *2. Such opinions must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and "not inconsistent" with the other "substantial evidence" in the individual's case record. *Id.* If the Secretary rejects the opinion of a treating physician, he must articulate a good reason for doing so. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

It is questionable whether a physician's opinion provided for purposes of litigation by means of checking boxes and filling in blanks on a form regarding a claimant's ability to do work-related activities constitutes a medical opinion entitled to substantial deference, particularly where, as here, the physician made essentially no attempt to support his opinions with reference to the medical record or his own treatment notes. Moreover, there is no evidence in the record that Dr. Able ever discussed with Plaintiff or examined her with regard to her ability to perform work-related activities such as standing, walking, lifting and concentrating. *Cf. Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding that the ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) ("[W]hile these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole.").

Regardless of whether the two forms filled out by Dr. Able may be considered "substantial evidence," the ALJ in this case gave good reasons for rejecting those portions of Dr. Able's opinions he did not find to be supported by the actual medical record: that the two assessments were inconsistent with each other, the second being much more restrictive, despite the fact that there was no objective evidence in the record that Plaintiff's condition had deteriorated to that extent; that there was no objective evidence in the record that Plaintiff actually had fibromyalgia, and that, to the contrary, substantial evidence in the record militated against a diagnosis of fibromyalgia; and, finally, that there was no

objective evidence in the record to support the more restrictive limitations in the first assessment. The ALJ referenced the opinion of Dr. Hampf, neurological surgeon, that the initial reading of Plaintiff's MRI in September 2004 had overestimated the severity of Plaintiff's condition, and that she in fact had only mild disc bulging with no significant stenosis or nerve root compromise.

The Court finds that the ALJ applied the correct legal standards and that his factual findings leading to his rejection of Dr. Able's form opinions are supported by substantial evidence in the record. 42 U.S.C. § 405(g).

**B.     The ALJ Did Not Err in Concluding Plaintiff Did Not Have a Valid Fibromyalgia Diagnosis.**

Plaintiff contends that the ALJ committed reversible error when, at Step Two of the Sequential Evaluation, he rejected her treating physician's diagnosis of fibromyalgia. Plaintiff's argument in this regard is without merit, for a number of reasons.

First, in the Sixth Circuit, the severity determination is "a *de minimis* hurdle in the disability determination process." *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). The purpose of the test is to "screen out totally groundless claims." *Id.* (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). In this case, the ALJ specifically found that Plaintiff's cervical degenerative disc disease and left shoulder tendinosis qualified as severe impairments. Plaintiff therefore cleared Step Two of the analysis. Plaintiff does not argue that a finding of fibromyalgia would have, *per se*, led to a determination that she was disabled. Accordingly, after finding that Plaintiff had severe impairments, the ALJ was required to consider *all* of Plaintiff's impairments, severe and non-severe, in the remaining steps of the sequential analysis, including her allegations of diffuse joint pain upon which the supposed diagnosis of fibromyalgia was based. In other words, the fact that the ALJ concluded that Plaintiff did not have a valid diagnosis of fibromyalgia is legally irrelevant as long as he made an initial finding that she suffered from a severe impairment, and subsequently took into account the symptoms she attributed to fibromyalgia as part and parcel of his consideration of her severe and non-severe impairments and their affect on her ability to do work-related activities. *See Anthony*, 266 Fed. Appx. at 457 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (likewise holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe)).

Moreover, the ALJ's conclusion that Plaintiff did not have a valid diagnosis of fibromyalgia is supported by substantial evidence in the record.  Throughout 2005 and early 2006, Dr. Able did not indicate that Plaintiff had been diagnosed with fibromyalgia.  As of the spring of 2006, one of her physicians noted "possible" fibromyalgia and referred her for a rheumatology consultation to rule out that diagnosis and to determine whether any other underlying condition might be causing her symptoms.  Plaintiff saw Dr. Fuchs for that purpose on June 8, 2006.  (*See* AR 167 (Nurse Assessment section noting "new patient, fibromyalgia").)  On that date, Dr. Fuchs specifically noted "no distinct tender points" and diagnosed "diffuse pain" with no complaints of ongoing connective tissue or autoimmune disease.  (AR 167.)  Despite the purpose of the visit, he did not diagnose fibromyalgia, nor did he indicate that any follow-up examination was needed.  He did not refer Plaintiff to a pain specialist and instead simply recommended that she work on "exercise/sleep hygiene and not use narcotics," and that she consider treatment with Elavil and Neurontin.  (AR 167.)

The Sixth Circuit has expressly recognized that fibromyalgia is difficult to confirm through objective testing since fibromyalgia patients generally present few or no objectively alarming signs.  *See Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (*per curiam*) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia); *see also Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain").  The Sixth Circuit has also noted, however, that "[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials."  *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 244 (6th Cir. 2007) (citing *Preston*, 854 F.2d at 820; *Swain*, 297 F. Supp. 2d at 990)).  In this case, then, Dr. Fuchs' conclusion that Plaintiff does not have any distinct tender points was tantamount to an affirmative conclusion that Plaintiff does not suffer from fibromyalgia.

Accordingly, the Court finds that the ALJ was justified in concluding that Dr. Fuchs "considered and *rejected*" a fibromyalgia diagnosis (AR 17).  Although, as the ALJ also observed, subsequent treatment notes from Dr. Able repeatedly reference a diagnosis of fibromyalgia (*see, e.g.*, AR 154, 208 (treatment notes from 9/21/2006 and 2/1/2007), those notes never indicate on what basis Dr. Able made

that diagnosis. In addition, Dr. Able continued to offer a rheumatology consultation (*see id.*), suggesting he remained unaware that Plaintiff had already consulted with Dr. Fuchs, and was equally unaware that Dr. Fuchs had concluded Plaintiff did not have the trigger-point tenderness characteristic of fibromyalgia.

In sum, the ALJ's determination that Plaintiff did not have a positive diagnosis of fibromyalgia was not reversible error.

### C.    The ALJ Did Not Err in Discounting Plaintiff's Credibility.

The record reflects that Plaintiff repeatedly complained to her treating physicians of pain ranging from 8 to 10 on a 10-point scale, and that she has been prescribed primarily ibuprofen and Lortab for the pain. She testified at the hearing that these medications do not fully relieve the pain, and that she has to lie down for twenty minutes or so three to four times out of an eight-hour workday. She also testified that she has approximately five bad days and two good days a week, and that a good day means she feels well enough to sit up and talk to her son or others. Otherwise, she purports to be quite limited in her ability to sit, stand, walk, bend, reach or lift because of her impairments.

The ALJ, however, in assessing Plaintiff's residual functional capacity, expressly found that Plaintiff's subjective complaints of pain and other symptoms, considered singly or in combination, were "not supported by the objective record as a whole as to preclude the ability to perform work related activities." (AR 19.) In support of his finding, the ALJ referenced the fact that, although Plaintiff alleged she had fibromyalgia, that diagnosis was not supported by the objective medical evidence. As indicated above, that conclusion is supported by substantial evidence in the record. The ALJ also found that Plaintiff's allegations that she could sit, stand, and walk for very limited time periods, and could lift or carry nothing heavier than "a can of peas," were not supported by the objective evidence which indicated that she had "mild" bulging discs with no significant spinal cord compression. (AR 19–20.) The ALJ also noted that Plaintiff's medical treatment had been "_extremely_ conservative in nature," insofar as she had never been referred for pain management, nor was surgical intervention ever recommended. In addition, he observed that the treatment notes from the Meharry Medical Group reveal that she reported difficulty with walking or getting up from a bed or chair on only one occasion. Otherwise, she repeatedly reported that she had not experienced a decline in the ability to walk, care for herself or to care for her home or others. Further, none of the treating or consulting physicians indicated that Plaintiff was as limited as she

claimed to be.  (AR 20.)

With respect to Plaintiff's allegations regarding the amount of time she needed to spend resting each day, the ALJ noted she had never been diagnosed with chronic fatigue syndrome.  The ALJ also observed that the medical record did not support Plaintiff's claim that her medications made her sleepy, nor did it support her claim that the medications did not work, as the treatment notes in the record repeatedly indicate Plaintiff reported that Lortab worked fairly well in controlling her pain.  In sum, based upon all of these factors, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 20.)

Because the ALJ is charged with the responsibility of observing the demeanor and credibility of the witness, his conclusions are to be highly regarded.  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Although Plaintiff contends that the ALJ did not follow the requirements of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p, pertaining to the Administration's consideration of an individual's allegations of disabling pain, the Court finds, as indicated above, that the ALJ expressly considered the relevant factors including the objective medical evidence, medical opinion evidence, Plaintiff's treatment, her medications, and her activities. 20 C.F.R. §§ 404.1529(c).  The ALJ's reasonable weighing of these factors in his consideration of Plaintiff's credibility will not be disturbed upon judicial review.

The Court finds that the ALJ complied with his obligations under the applicable law in weighing Plaintiff's credibility and reaching a determination that her allegations of disabling pain were not fully credible.  Moreover, his conclusions are supported by substantial evidence in the record.

V.     **CONCLUSION**

For the reasons set forth above, the Court will deny Plaintiff's motion for judgment and grant the Commissioner's motion for judgment.  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge